JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ECOLAB INC. and NALCO COMPANY, LLC

## DEFENDANTS

DOUGLAS P. GLANZ and CHEMTREAT, INC.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Hamilton**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Fisher & Phillips LLP, 400 West Street, # 400, Columbus, Ohio 43215; 614-453-7608

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [x] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [x] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

### CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### PRISONER PETITIONS
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty
**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [x] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332

Brief description of cause:
Breach of non-compete agreement; tortious interference.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*  JUDGE _____  DOCKET NUMBER _____

DATE  4/8/2022

SIGNATURE OF ATTORNEY OF RECORD  /s/ Mathew A. Parker

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| **ECOLAB INC., and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water,** | **CIVIL ACTION NO.: 1:22-CV-197** |
| **Plaintiffs,** | **JUDGE:** |
| | **MAGISTRATE JUDGE:** |
| **v.** | **JURY DEMAND ENDORSED HEREON** |
| **DOUGLAS P. GLANZ and CHEMTREAT, INC.,** | |
| **Defendants.** | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiffs Ecolab Inc. ("Ecolab") and Nalco Company LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water ("Nalco") (both Ecolab and Nalco will be referred to as "Nalco/Ecolab" or "Plaintiffs"), by counsel, bring this Complaint for Injunctive Relief and Damages against Defendant Douglas P. Glanz (hereafter "Glanz") and ChemTreat, Inc. (hereafter "ChemTreat") and allege as follows:

**NATURE OF ACTION**

1.      Nalco/Ecolab bring this action for injunctive relief and damages against its former employee, Senior Industry Technical Consultant Douglas P. Glanz, for breach of the post-employment restrictive covenants in his Management Employment Agreement with Nalco/Ecolab ("Agreement") (A copy of the Agreement is attached hereto as Exhibit A). Glanz voluntarily resigned his employment with Nalco/Ecolab to join its competitor ChemTreat where he is employed in the same position he held at Nalco/Ecolab.  Glanz's employment with ChemTreat is a blatant violation of the terms of his Agreement with Nalco/Ecolab.  Nalco/Ecolab assert a claim

against Glanz for breach of contract and a claim against ChemTreat for tortious interference with Glanz's Agreement.

## THE PARTIES

2.      Ecolab is a Delaware corporation with its principal place of business in the State of Minnesota.  Ecolab is registered to do business and regularly conducts business in the State of Ohio and maintains an office at 4270 Ivy Pointe Blvd., Suite 200, Cincinnati, OH 45245.

3.      Nalco is a Delaware corporation with its principal place of business in the State of Illinois.  Nalco is registered to do business and regularly conducts business in the State of Ohio and maintains an office at 4270 Ivy Pointe Blvd., Suite 200, Cincinnati, OH 45245.

4.      Nalco does business under the trade names "Nalco Water, an Ecolab Company" and "Nalco Water."

5.      Ecolab and Nalco maintain a robust business in Ohio, and throughout the United States.

6.      Douglas P. Glanz is an individual who, upon information and belief, resides in Hamilton County, Ohio and is currently employed by ChemTreat.

7.      ChemTreat is a Virginia corporation with its principal place of business in Virginia. ChemTreat is licensed to do business within the State of Ohio and regularly conducts business within the State.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this dispute by virtue of diversity of citizenship, pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

8. The Court has personal jurisdiction over Glanz because he did and still does reside in the District in which this Court sits, he has transacted business in Ohio, he had entered into and performed under the Agreement in Ohio, he owed a fiduciary duty to a company in Ohio, and Glanz's and ChemTreat's actions that give rise to Nalco/Ecolab's claims occurred in Ohio.

9. This Court has personal jurisdiction over ChemTreat because ChemTreat is a foreign limited liability company registered with the Ohio Secretary of State to do business in Ohio that regularly transacts business in Ohio, including in the District in which this Court sits.

10. Venue is proper in this Court as it is the judicial district in which Glanz resides, where ChemTreat regularly transacts business in Ohio, and where Glanz and ChemTreat have engaged in conduct giving rise to the claims in the Complaint.

## FACTUAL ALLEGATIONS

11. Nalco/Ecolab, among other things, are engaged in the highly-competitive business of monitoring and controlling performance of industrial water treatment systems for clients in a wide range of industries including, but not limited to, food preparation, pulp and paper, agriculture, manufacturing, refining, mining, power production, healthcare, pharmaceutical, and high tech businesses.

12. Nalco/Ecolab provide a broad spectrum of products and services to businesses throughout the United States including the State of Ohio. Nalco/Ecolab partner with customers across a wide range of industries and develop solutions for such customers' specific water needs and business goals throughout the United States including the State of Ohio.

13. Nalco, a wholly owned subsidiary of Ecolab company, is engaged in the highly competitive business of helping customers reduce energy, water, and other natural resource

consumption, enhance air quality, minimize environmental releases and improve productivity and end products while boosting its customers' bottom line.

14.     In order to protect its confidential and trade secret information, Nalco/Ecolab, among other things, require appropriate employees to execute employment agreements containing restrictive covenants tailored to protect its valuable company assets, including but not limited to, (1) prohibiting employees who leave Nalco/Ecolab from working for a competing organization in a position where the former employee would likely disclose Nalco/Ecolab's confidential information and/or its trade secrets; (2) prohibiting the use and/or disclosure of Nalco/Ecolab's confidential and trade secret information; (3) prohibiting employees from transferring or storing company information onto any device or storage medium (physical or virtual) not provided or authorized in writing by Nalco/Ecolab; (4) prohibiting departing employees from wiping, deleting or transferring any company data from any electronic devices before returning such devices to the company; (5) requiring employees who separate from Nalco/Ecolab to return all company property, data, business information, phones, computers, and electronic devices; (6) requiring employees to acknowledge and agree that Nalco/Ecolab has the right to conduct forensic examination(s) of any computers and/or electronic devices in the employees' possession and control if Nalco/Ecolab reasonably believe such devices contain Nalco/Ecolab's confidential or trade secret information; and (7) prohibiting employees who separate from Nalco from soliciting or transacting business with a limited group of customers after separation of employment.

15.     Nalco/Ecolab, in addition to using employment agreements containing nondisclosure and noncompetition covenants, also uses computer passwords, limits access to confidential information to employees that need the information in order to perform their duties for Nalco/Ecolab, maintains confidentiality policies in its employee handbook, maintains

electronic communication and code of conduct policies regarding confidentiality, and stresses the importance of maintaining confidentiality in order to protect its confidential and trade secret information.

16. Nalco/Ecolab uses a secure computer network to store and maintain its confidential, proprietary, and trade-secret information.

17. Nalco/Ecolab limits access to portions of its secure computer systems to key employees who have a need to access the confidential and trade secret information to perform their job duties, including but not limited to, Glanz during his employment with Nalco/Ecolab.

**GLANZ'S EMPLOYMENT**

18. In or about February 2007, Glanz was hired by Nalco as an Account Coordination Manager.

19. In 2011, Nalco merged with Ecolab and became a wholly owned subsidiary of Ecolab.

20. Glanz worked for Nalco/Ecolab as a Global Corporate Account Manager, and, most recently, a Senior Industry Technical Consultant.

21. During Glanz's employment with Nalco/Ecolab, Glanz obtained training on-the-job and through attending industry-specific seminars.

22. As a Senior Industry Technical Consultant, Glanz worked for Nalco/Ecolab throughout the country and maintained an office in the State of Ohio.

23. As a Senior Industry Technical Consultant, Glanz worked with Nalco/Ecolab's sales personnel and customers and was responsible for solving complex issues for Nalco/Ecolab's customers and recommending the best water process technology to customers and Nalco/Ecolab's

sales representatives. Glanz is an industry expert for, among other fields, water membrane filtration.

24. As a trusted employee of Nalco/Ecolab, Glanz was privy to and given substantial access to Nalco/Ecolab's confidential information regarding Nalco/Ecolab's customers, products, and processes.

25. As a Senior Industry Technical Consultant, Glanz had access to and used Nalco/Ecolab's confidential and trade secret information for products and services within the scope of his job duties. Specifically, Glanz had access to and used, for example, Nalco/Ecolab's information related to Nalco/Ecolab's products, technical specifications of products, development and design information, product development, key features and benefits of products, customer information, customer preference for Nalco/Ecolab's materials and products, cost and pricing information, and customer-related sales and pricing files. Glanz used this information daily and had extensive knowledge of the products and information.

## THE GLANZ AGREEMENT

26. In exchange of monetary benefits, including, but not limited to, a long-term incentive grant, and other consideration, Glanz entered into the Management Employment Agreement on December 31, 2019. A true and correct copy of the Agreement is attached as Exhibit A and incorporated herein by reference.

27. Glanz electronically reviewed, assented to, and accepted the Agreement. Glanz reviewed and electronically signed the Agreement through Adobe sign. His acceptance was manifested through using his electronic signature with a corresponding date stamp to record the date of his signature and acceptance of the Agreement. *See* Exhibit A.

28. Under the terms of the Agreement, for a period of eighteen (18) months after Glanz's employment ends with Nalco/Ecolab, he is, among other things, contractually obligated as follows:

> 9(a) Employee will not within the Restricted Territory (as defined below) render services to a Conflicting Organization (as defined below) in any role or position that is the same or substantially similar to any position Employee held at the Company in the eighteen (18) month period immediately preceding Employee's cessation of employment with the Company;
>
> * * *
>
> 9(d) Employee will not within the Restricted Territory provide services to a Conflicting Organization in any position in which any reliance on the use or disclosure of the Company's Confidential Information to which Employee was exposed during the last eighteen (18) months of Employee's employment with the Company would inevitably support or facilitate the performance of Employee's duties for a Conflicting Organization;

*See* Exhibit A, Agreement ¶ 9(a) and (d).

29. "Restricted Territory" is defined in the Agreement as follows:

> For purposes of this Agreement, "Restricted Territory" means any of the following severable territories:
>
> i. United States.
>
> ii. Any state in the United States in which the Company shipped products or provided services at any time during the eighteen (18) months immediately preceding Employee's cessation of employment with the Company.
>
> iii. Any county, province, or parish or any substantially similar territorial unit in which Employee provided services or products on behalf of the Company during the eighteen (18) month period preceding the termination of Employee's employment with the Company.

*See* Exhibit A, Agreement ¶ 9.

30.     Additionally, "Conflicting Organization" is defined as "any person or organization (including one owned in whole or in part by Employee) which is engaged in or is about to become engaged in the research on, or the development, production, marketing or sale of, or consulting pertaining to, a Conflicting Product or Service."  *See* Exhibit A, Agreement ¶ 9.

31.     Lastly, a "Conflicting Product or Service" is defined as follows:

> For the purposes of this Agreement, a "Conflicting Product or Service" means any product or process of, or service by, any person or organization other than Company, in existence or under development, which is the same as or similar to or improves upon or competes with a product or process of, or service rendered by, Company which Employee either worked on, performed or sold during Employee's last eighteen (18) months of their employment by Company.

*See* Exhibit A, Agreement ¶ 9.

32.     Glanz's Agreement also contains covenants regarding the non-solicitation of customers and employees, confidentiality, and the return of property.  *See* Exhibit A, Agreement ¶¶ 9(b), 9(c), 9(e), and 12.

**GLANZ RESIGNS FROM NALCO/ECOLAB AND SUBSEQUENT EMPLOYMENT**

33.     Glanz resigned his employment with Nalco/Ecolab in April of 2021.

34.     According to Glanz's LinkedIn profile, as of April 2021, Glanz became employed at ChemTreat as a Senior Technical Consultant - Pretreatment, which is the same position he held while employed by Nalco/Ecolab.

35.     ChemTreat is a direct competitor of Nalco/Ecolab in the industrial water treatment marketplace. ChemTreat provides its services to industries such as chemical processing, food and beverage, general manufacturing, mining and minerals, power producers, pulp and paper, commercial facilities, primary metals, and transportation.

36.     Similar to Nalco/Ecolab, ChemTreat designs industrial water treatment programs to help customers improve operating efficiency, protect equipment assets, and meet their environmental goals.  Additionally, ChemTreat engages in the business of boiler water treatment, cooling water treatment, water pretreatment and filtration, industrial wastewater treatment, and water reclamation and reuse.

37.     In sum, ChemTreat markets, provides, and sells products, processes, and services to its customers that are the same or are similar to those which Nalco/Ecolab provide to their customers.

**COUNT I**
**Breach of Contract**
**(As to Glanz)**

38.     Nalco/Ecolab re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

39.     On or about December 31, 2019, Glanz and Nalco/Ecolab entered into an Management Employment Agreement.

40.     The parties' Agreement is a valid and enforceable contract.

41.     Glanz reviewed, accepted, and assented to the Agreement.

42.     Glanz received consideration for entering into the Agreement, including, but not limited to, monetary compensation in the form of a long-term incentive grant.

43.     Nalco/Ecolab has performed all of it respective duties as required under the Agreement.

44.     Glanz is subject to and legally bound by the promises made in his Agreement with Nalco/Ecolab.

45. The non-competition limitations in Glanz's Agreement are reasonable as to time, geographic scope, and scope of restrained activity.

46. The Agreement's terms and restrictions are narrowly tailored and do not impose restraints on Glanz that are greater than necessary to protect Nalco/Ecolab's legitimate business interests.

47. Glanz breached his contractual obligations by becoming and continuing to remain employed by ChemTreat, a direct competitor of Nalco/Ecolab, in positions and geographic regions where his knowledge of Nalco/Ecolab's confidential and trade secret information would support or facilitate performance of his duties at ChemTreat.

48. As a direct and proximate result of Glanz's breach of his contractual obligations, Nalco/Ecolab has and is being subject to irreparable harm and damages, including, but not limited to, damages to Plaintiffs' customer goodwill, customer relationships, and loss of business, entitling Nalco/Ecolab to an award of injunctive relief and monetary damages.

49. As a direct and proximate result of Glanz's breach of the Agreement, Nalco/Ecolab has and will lose competitive standing and goodwill in the marketplace in which Nalco/Ecolab and ChemTreat compete.

50. As a direct and proximate result of Glanz's breach of his contractual obligations, Nalco/Ecolab's damages include the loss of its exclusive use of confidential business information that provides it with a competitive advantage and is not known or available to the public, including information to which Glanz had access relating to Nalco/Ecolab's products, technical specifications of products, development and design information, product development, key features and benefits of products, customer information, customer preference for Nalco/Ecolab's materials and products, cost and pricing information, and customer-related sales and pricing files.

Glanz cannot perform the same or substantially similar duties for a direct competitor of Nalco/Ecolab without inevitably using, relying upon, and/or disclosing such information in the performance of his job duties.

51.     The actions of Glanz were and are willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Nalco/Ecolab.

52.     But for an exercise of the equitable powers of this Court, Nalco/Ecolab will be irreparably injured and harmed by Glanz's ongoing conduct.

**COUNT II**
**Tortious Interference with Contractual Relationships**
**(As to ChemTreat)**

53.     Nalco/Ecolab re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

54.     As set forth herein, Glanz entered into valid and enforceable Employment Agreement with Nalco/Ecolab.

55.     Upon information and belief, ChemTreat was aware of his contractual obligations to Nalco/Ecolab.

56.     Upon information and belief, ChemTreat intentionally and without justification interfered with Nalco/Ecolab's contractual relationship with Glanz, including but not limited to, soliciting his employment at ChemTreat and continuing his employment with ChemTreat despite its knowledge of Glanz's contractual obligations to Nalco/Ecolab.

57.     Upon information and belief, ChemTreat's intentional interference with Nalco/Ecolab's contractual relationship with Glanz directly and proximately caused a material breach of Glanz's contractual obligations owed to Nalco/Ecolab, causing Nalco/Ecolab to suffer irreparable harm and damages.

58. Upon information and belief, ChemTreat has acted and is acting with an improper motive and through improper means to procure the breach of and intentionally interfere with Nalco/Ecolab's contractual relationship with Glanz by supporting and encouraging him to disregard his contractual obligations and obtaining and benefitting economically from its actions to the detriment of Nalco/Ecolab.

59. As a direct and proximate result of ChemTreat's intentional interference with Glanz's contractual obligations to Nalco/Ecolab, Nalco/Ecolab's damages include the loss of its exclusive use of confidential business information that provides it with a competitive advantage and is not known or available to the public, including information to which Glanz had access relating to Nalco/Ecolab's products, technical specifications of products, development and design information, product development, key features and benefits of products, customer information, customer preference for Nalco/Ecolab's materials and products, cost and pricing information, and customer-related sales and pricing files. Glanz cannot perform the same or substantially similar duties for a direct competitor of Nalco/Ecolab without inevitably using, disclosing, and/or relying upon such information in the performance of his job duties.

60. As a direct and proximate result of ChemTreat's conduct in this regard, Nalco/Ecolab has suffered and will continue to suffer irreparable harm and damages.

61. The actions of ChemTreat were and are willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Nalco/Ecolab.

62. But for an exercise of the equitable powers of this Court, Nalco/Ecolab will be irreparably injured and harmed by ChemTreat's ongoing conduct.

## **JURY DEMAND**

63. Nalco/Ecolab respectfully demand a trial by jury on all counts.

## PRAYER FOR RELIEF

WHEREFORE, by virtue of the foregoing acts complained of, Plaintiffs Ecolab Inc. and Nalco Company LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water respectfully request that this Honorable Court enter one or more orders granting it the following relief:

A.      A permanent injunction requiring Glanz to cease working for ChemTreat in a position that is the same or substantially similar to the position Glanz held with Nalco/Ecolab for a period of eighteen (18) months;

B.      A permanent injunction requiring Glanz to cease working for ChemTreat in a position where the use or disclosure of Nalco/Ecolab's confidential information would be used to support or facilitate his duties at ChemTreat for a period of eighteen (18) months;

C.      An extension of the length of the non-competition restrictions set forth in the Agreement for the same amount of time that Glanz has been in violation of the same;

D.      An Order requiring Glanz to return to Nalco/Ecolab all Nalco/Ecolab property in Glanz's possession;

E.      Enjoining Glanz from further breaching his legal and contractual duties to Nalco/Ecolab;

F.      Judgment in favor of Nalco/Ecolab and against Glanz and ChemTreat;

G.      An award to Nalco/Ecolab of actual damages;

H.      An award to Nalco/Ecolab of punitive and/or exemplary damages;

I.      An award to Nalco/Ecolab of pre-judgment and post-judgment interest;

J.     An award to Nalco/Ecolab of its reasonable attorneys' fees and its costs incurred in

       this action; and

K.     Such other and further relief as this Court deems just and proper.

Dated this the 11th day of April, 2022.          Respectfully submitted,

                                                 **FISHER & PHILLIPS LLP**

                                                 /s/ Mathew A. Parker
                                                 Mathew A. Parker (0093231)
                                                 250 West Street, Suite 400
                                                 Columbus, Ohio 43215
                                                 (614) 221-1425
                                                 (614) 221-1409 Fax
                                                 mparker@fisherphillips.com

                                                 Brandon J. Crainer
                                                 (*pro hac vice to be filed*)
                                                 FISHER & PHILLIPS LLP
                                                 227 West Trade Street
                                                 Suite 2020
                                                 Charlotte, NC 28202
                                                 Telephone: 704.334.4565
                                                 Fax: 704.334.9774
                                                 bcrainer@fisherphillips.com

                                                 *Counsel for ECOLAB INC. and NALCO*
                                                 *COMPANY, LLC d/b/a Nalco Water, an*
                                                 *Ecolab Company and/or Nalco Water*

# Exhibit A

**Management Employment Agreement**

ECOLAB

Ecolab Center
St. Paul, MN 55102

**This AGREEMENT is made and entered into between Ecolab Inc., a Delaware corporation, its parent companies, sister companies and subsidiaries (hereafter the "Company") and _____ (the "Employee").**

The Company's business is highly competitive and the Company has invested considerable sums of money in developing products, equipment, training programs, sales programs, technical service programs and account records for the proper servicing of its customers. Employee is being hired or promoted by the Company into a management position where Employee will have an opportunity to help shape, supervise and carry out strategic business plans and opportunities for the Company. Employee acknowledges that this Agreement is a pre-condition of Employee's management position and receipt of related benefits. While employed with the Company, Employee has and will continue to receive valuable training and has been and will be entrusted with sensitive, confidential information about the Company. In return, Employee agrees not to use this training and information to unfairly compete against the Company. Employee also agrees that the restraints imposed by this Agreement are reasonable and necessary to protect the Company's business, goodwill, customer relationships, and the jobs of other Company employees.

Therefore, in consideration of the covenants and agreements contained herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. The Company will employ Employee in a management position for such period of time and for such compensation, including salary and employee benefits, as may be mutually agreeable to both parties. Both the Company and Employee shall have the right to terminate the employment at any time, and Employee's employment shall be, at all times, terminable at will. This at-will employment relationship may not be modified except as in writing signed by Employee and an authorized officer of the Company.

2. Employee acknowledges that as a result of Employee's employment with Ecolab, Employee will acquire knowledge of Company's Trade Secrets and its Confidential Information, which may include without limitation, information regarding present and future operations, customers and suppliers, pricing, margins, business strategies, business methods, product formulae, and employees (including the particular skills, talents and abilities of those employees).

Employee hereby agrees that Employee will hold in a fiduciary capacity for the benefit of the Company, and shall not directly or indirectly use or disclose any Trade Secrets, as defined hereinafter, that Employee may have acquired during the term of Employee's employment with Company for so long as such information remains a Trade Secret.

The term "Trade Secret" as used in this Agreement shall mean information pertaining to Company including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, financial data, financial plans, product plans, a list of actual or potential customers or suppliers, pricing information, information about customer contacts, requirements or purchasing patterns, or the identities of or contact information for actual or potential customers or suppliers of Company that both:

(a) derives economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts by Company that are reasonable under the circumstances to maintain its secrecy.

In addition to the foregoing and not in limitation thereof, Employee agrees that while employed with the Company and for a period of three (3) years after termination of Employee's employment with the Company, Employee will hold in a fiduciary capacity for the benefit of the Company and shall not, directly or indirectly, use or disclose any Confidential Information, as defined hereinafter, that Employee may have acquired (whether or not developed or compiled by Employee and whether or not Employee was authorized to have access to such Confidential Information) during the term of, in the course of, or as a result of Employee's employment by Company.

The term "Confidential Information" shall mean the Company's confidential data or information which is valuable to Company but substantially inaccessible to the public and to competitors of the Company, including, without limitation, business information, financial data, product information, the identities and contact information of actual or potential customers or suppliers, pricing information, and other information of a proprietary nature regarding the Company's business operations, excluding Trade Secrets. Notwithstanding the foregoing, the term Confidential Information shall not include information that Employee can establish by

1

competent proof: (i) was generally known to or accessible by the public at the time Company disclosed the information to Employee; (ii) became generally known to or accessible by the public after disclosure by the Company through no act or omission by Employee; or (iii) was disclosed to Employee, after the Employee's termination of employment from the Company, by a third party having a bona fide right both to possess the information and to disclose the information to Employee, provided such third party is not subject to an obligation of confidentiality with respect to such information.

The Company will train Employee in Employee's particular management position and will provide Employee with special techniques and information, including Confidential Information, which the Company believes will be helpful and necessary to the performance of Employee's duties.

Employee understands Employee may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret that is made (a) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney if such disclosure is made solely for the purpose of reporting or investigating a suspected violation of law or for pursuing an anti-retaliation lawsuit; or (b) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and Employee does not disclose the Trade Secret except pursuant to a court order.

3. Ecolab is committed to compliance with applicable federal, state and local laws. As such, nothing in this Agreement prohibits Employee from reporting possible violations of law to any government agency if such report is made in confidence and good faith to a federal, state or local government official, either directly or indirectly, solely for the purpose of reporting or investigating a suspected violation of law or for pursuing an anti-retaliation lawsuit relating to such report. Nothing in this Agreement is to be construed to prohibit the Company from bringing any claims against Employee, including but not limited to, statutory claims for Trade Secret misappropriation. Nothing in this Agreement is to be construed to unlawfully limit any rights Employee may have under the National Labor Relations Act.

4. Employee will not accept any other full or part-time employment to be performed in whole or in part while still employed by Company without first notifying Company of the nature and location of such other employment and the name of such other employer. Employee will not accept any such employment if it in any way interferes with the performance of Employee's duties to Company or represents an unreasonable risk of compromising Confidential Information.

5. During Employee's employment with Company, Employee agrees not to plan, organize or engage in any business competitive with any product or service marketed, or planned for marketing by Company or participate with or assist others to do so.

6. When Company owned computers, computer devices, e-mail addresses, phones and/or electronic devices are issued to Employee, Employee shall conduct Company business and communicate with customers, vendors and the public regarding Company business only on the Company computer network and using such Company-provided electronic technology. Employee agrees that Employee will not transfer or store any Company information on any device or other storage medium (physical or virtual) not provided or authorized by the Company unless authorized to do so by the Company in writing. Employee has no right to privacy with respect to any data that is stored on any device issued to Employee by the Company and/or authorized for Employee to use for Company business. As soon as Employee begins to consider leaving the Company or Employee realizes Employee's employment with the Company has or will soon come to an end, Employee will not wipe, delete or transfer or cause any Company data to be wiped, deleted or transferred from any such device before returning the device to the Company.

7. Subject to the provisions of Section 9, Employees are free at any time to leave the employment of Company upon proper notice and, subject to the limitations set forth herein, accept any job that utilizes Employee's general education and skills except one that would create an unreasonable risk of compromising Company's Confidential Information.

8. If Employee's new employer could be construed as a Conflicting Organization (as defined in Section 9), Employee will inform Employee's new employer, prior to accepting employment, of the existence of this Agreement and provide such employer with a copy. Employee will provide to the Company written assurances satisfactory to the Company describing Employee's position and that it will not compromise the Company's customers and/or Confidential Information, and will not violate the terms of this Agreement.

9. For a period of eighteen (18) months after Employee's employment with Company ends:

(a) Employee will not within the Restricted Territory (as defined below) render services to a Conflicting Organization (as defined below) in any role or position that is the same or substantially similar to any position Employee held at the Company in the eighteen (18) month period immediately preceding Employee's cessation of employment with the Company;

(b) Employee will not solicit, encourage or induce any Customer (as defined below) for the purpose of

2

providing them a Conflicting Product or Service (as defined below);

(c) Employee will not transact business with any Customer, for the purpose of providing a Conflicting Product or Service;

(d) Employee will not within the Restricted Territory provide services to a Conflicting Organization in any position in which any reliance on the use or disclosure of the Company's Confidential Information to which Employee was exposed during the last eighteen (18) months of Employee's employment with the Company would inevitably support or facilitate the performance of Employee's duties for a Conflicting Organization;

(e) Employee will not hire or induce, attempt to induce or in any way assist or act in concert with any other person or organization in hiring, inducing or attempting to induce any employee or agent of Company to terminate such employee's or agent's relationship with Company. This restriction is limited to those employees that Employee managed, or supervised, or had material contact with on the Company's behalf during the last eighteen (18) months of Employee's employment with Company.

For purposes of this Agreement, "Restricted Territory" means any of the following severable territories:

i. United States.

ii. Any state in the United States in which the Company shipped products or provided services at any time during the eighteen (18) months immediately preceding Employee's cessation of employment with the Company.

iii. Any county, province, or parish or any substantially similar territorial unit in which Employee provided services or products on behalf of the Company during the eighteen (18) month period preceding the termination of Employee's employment with the Company.

The parties agree that the aforementioned territories are intended to be severable in the event a court were to determine any territory to be overbroad.

For purposes of this Agreement, a Customer of the Company is defined as a customer with whom Employee in the past twelve (12) months:

i. Had material business contact with on behalf of the Company; or

ii. Whose account was assigned to Employee; or

iii. Whose account was assigned to another employee that Employee supervised or managed; or

iv. About or from whom Employee received confidential information.

Nothing in the covenants in Subsections 9(a) or 9(b) would prohibit Employee's employment with a Conflicting Organization in a capacity unrelated to a Conflicting Product or Service.

For the purposes of this Agreement, a "Conflicting Product or Service" means any product or process of, or service by, any person or organization other than Company, in existence or under development, which is the same as or similar to or improves upon or competes with a product or process of, or service rendered by, Company which Employee either worked on, performed or sold during Employee's last eighteen (18) months of their employment by Company.

A "Conflicting Organization" means any person or organization (including one owned in whole or in part by Employee) which is engaged in or is about to become engaged in the research on, or the development, production, marketing or sale of, or consulting pertaining to, a Conflicting Product or Service.

10. Employee will fully and promptly communicate to Company in writing all inventions, improvements, devices, processes, treatments, formula, and compounds, whether patentable or not (hereinafter "Inventions") which are first conceived or first reduced to practice by Employee, whether individually or jointly with others, during Employee's employment and which pertain to Company's business. Inventions shall be deemed to pertain to Company's business if they relate to any business in which Company is actively engaged, to any business in which Company is conducting research or considering conducting research and development, or to any business which is directly related to any work actually assigned to Employee by Company. All such Inventions shall be the sole and exclusive property of Company and Employee hereby assigns all right, title and interest in and to such Inventions to Company. Any Inventions, which relate to the business of Company, first disclosed by Employee to anyone within one (1) year after termination of Employee's employment with Company shall be deemed to have been first conceived by Employee during Employee's employment with Company. The provisions of this Section shall not apply to an Invention for which no equipment, supplies, facilities or Trade Secret information of Company was used and which was developed entirely on Employee's own time and (1) which does not relate to Company's business or development, or (2) which does not result from any work performed by Employee for Company.

11. Employee will keep and maintain adequate and current written records of all Inventions at all stages of development, in the form of notes, sketches, drawings

3

and reports relating thereto. All such records shall be and remain the property of Company at all times. Upon termination of employment, Employee agrees to return all such records to Company and shall not keep copies of such records. Employee will also, during and after Employee's employment by Company, at the request of Company, assist Company in every way proper to obtain and to vest in its title to patents on such Inventions in all countries by executing and delivering all documents necessary or desirable to accomplish such end. If Company becomes involved in any litigation, arbitration proceeding or any administrative proceeding that requires Employee's assistance, Employee will cooperate with Company both during and after Employee's employment and will render such assistance and advice to Company as Company may deem necessary or desirable. Company will reimburse Employee for all expenses reasonably incurred by Employee in performing the acts for Company described in this Section and if Employee is no longer employed by Company at the time, Company shall compensate Employee at an hourly rate commensurate with Employee's then current rate of salary.

12. Upon termination of Employee's employment and/or promptly upon request, the Employee will return in good order all Company property and information in the Employee's possession, custody or control. Upon termination, Employee shall return all Company data, business information, credit cards, keys, automobiles and any other Company property in Employee's possession. Employee shall not erase or delete any Company data from Company phones or computer or other electronic devices except as may be necessary in the regular course of conducting business for the Company. For example, it would be a violation of this provision for Employee to accept a position with another entity and/or give notice of Employee's resignation and then delete and/or erase Company data from Employee's Company assigned phone and/or computer device.

13. In the event the Employee violates, or the Company reasonably believes the Employee is about to violate, this Agreement, the Employee agrees that the Company is entitled to injunctive relief to prevent violation(s) and/or preserve the *status quo* and confidentiality of the Company's Confidential Information and Trade Secrets. The Employee agrees that in any proceeding alleging breach of this Agreement, each party shall have the right to engage in deposition and document discovery, and the Company will have the right to conduct forensic examination(s) of any computers and/or electronic devices in the Employee's possession or control, if the Company reasonably believes such devices contain Company Confidential Information. The Employee further agrees that in connection with any application for injunctive relief, discovery shall be conducted on an expedited basis.

14. All of the provisions of the Agreement which are to be effective following termination of Employee's

employment, shall be effective whether or not such termination was voluntary or involuntary. Employee warrants that prior to entering into this Agreement Employee has disclosed to Company any agreements with any previous employers which would prevent Employee from performing any duties for Company.

15. This Agreement shall not become effective or be binding upon Employee and Company until accepted on behalf of Company by the signature hereon of a corporate officer of Company in St. Paul, Minnesota. This Agreement supersedes any previous agreements between Employee and Company, written or oral, relating to this subject matter and may be amended or modified only by a writing signed by Employee and a corporate officer of Company. Notwithstanding the previous sentence should a court of competent jurisdiction invalidate the restrictive covenants set forth at Section 9 because of either: (1) lack of consideration, or (2) for being unenforceable and not subject to being reformed by severing or modification, the next most recent agreement between Employee and Company containing such noncompete restrictions shall be given effect. All references to Company shall be construed to include subsidiaries of Company.

16. If any of the provisions of this Agreement are held to be invalid or unenforceable by a court of competent jurisdiction, such holding shall not invalidate any of the other provisions of this Agreement, it being intended that the provisions of this Agreement are severable. The provision held to be invalid or unenforceable shall be deemed modified to the minimum extent necessary to make that provision consistent with applicable law, and in its modified form, that provision shall then be enforceable.

17. The restrictive covenants and provisions contained in this Agreement, including but not limited to Section 9, each paragraph and subparagraph, are severable. The parties further agree that if any of the restrictions set forth in any section and/or any paragraph and the subparagraphs contained therein shall be held not to be enforceable because they are overbroad for any reason whatsoever, it is agreed that the restriction shall be effective to such extent as it may be enforceable. The parties specifically authorize a court of competent jurisdiction to strike, amend and/or alter such provisions to the extent necessary to render them reasonable and enforceable as this is the mutual intent of the Parties. This Agreement and the covenants herein shall inure to the benefit of the Company's successors or assigns.

18. In any successful proceeding brought to enforce the Company's rights under this Agreement, the Company shall recover court costs and reimbursement of Company's attorney's fee and disbursements. These damages are in addition to any other relief, including injunctive relief, to which the Company may be entitled.

4

Accepted by
Ecolab Inc.

*[signature]*

Laurie Marsh
By

Executive Vice President, Human Resources
Title

_____
Date

I have carefully read and understand and agree to all of
the terms of this agreement.

_____
Employee Signature

_____
Date

**Signature:** *Douglas P. Glanz*
Douglas P. Glanz (Dec 13, 2019)

**Email:** dpglanz@ecolab.com